1  Jack Silver, Esq. SBN  #160575
   Law Office of Jack Silver
2  Post Office Box 5469
   Santa Rosa, CA 95402-5469
3  Tel.(707) 528-8175
   Fax.(707) 528-8675
4  lhm28843@sbcglobal.net

5  Attorneys for Plaintiff
   NORTHERN CALIFORNIA RIVER WATCH
6

7            UNITED STATES DISTRICT COURT

8          NORTHERN DISTRICT OF CALIFORNIA

9

10 NORTHERN CALIFORNIA RIVER         CASE NO.: 4:10-cv-00534 PJH
   WATCH, a non-profit corporation,
11                                   **PLAINTIFF'S MEMORANDUM OF**
                        Plaintiff,   **POINTS AND AUTHORITIES IN**
12      v.                           **OPPOSITION TO DEFENDANT EXXON**
                                     **MOBIL CORPORATION'S MOTION TO**
13 EXXON MOBIL CORPORATION           **DISMISS COMPLAINT PURSUANT TO**
   and DOES 1-20, Inclusive,         **F.R.C.P. 12(b)(6)**
14
                        Defendants.  Date:      June 23, 2010
15                                   Time:      9:00 a.m.
                                     Ctrm:      3
16                                   Judge:     Hon. Phyllis J. Hamilton

17                                   Complaint Filed:   February 5, 2010
   _____/ Trial Date:      None Set
18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    A.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    B.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4          1.    6301 Commerce Boulevard, Rohnert Park, CA  . . . . . . . . . . . . . . . . . . . . 3

5          2.    175 Southwest Boulevard, Rohnert Park, CA . . . . . . . . . . . . . . . . . . . . . . 4

6          3.    153 Old Redwood Highway North, Petaluma, CA . . . . . . . . . . . . . . . . . . 5

7    C.    APPLICABLE LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8          1.    NCRW's 42 U.S.C. § 6972 (a)(1)(B) Imminent Hazard Claim  . . . . . . . . . . . 7

9          2.    NCRW's 42 U.S.C. § 6972 (a)(1)(A) Enforcement Action  . . . . . . . . . . . . . 7

10   D.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11   E.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12         1.    Exxon Has Ongoing Liability for Current RCRA Violations by
                 Reason of Its Failures to Remediate the Sites  . . . . . . . . . . . . . . . . . . . . . . . . 8
13
14               A.    Exxon's Violations of These Regulatory Requirements  . . . . . . . . . . 10

15               B.    Such Violations of RCRA Regulations Have Been Held
                       to Prolong the Liability of Former Owners or Operators
16                     of UST Sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17               C.    Exxon's Case Authority Represents Decisions  in a Minority
                       of Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18         2.    Exxon's Alleged Violations Are Not Wholly Past Violations Because
                 the Need for Remediation Continues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
19
20         3.    Federal Law Applicable to Motions to Dismiss under FRCP 12(b)(6)  . . . . . . 17

     F.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21

22

23

24

25

26

i

27

28

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Acme Printing Ink  Co.  v.  Menard, Inc.*
  891 F. Supp. 1289 (E.D. Wisc.  1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4

*Ashcroft v. Iqbal*
556 U.S. ___, 129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5

6

*Atlanta Gas Light Co. v. UGI Utils.  Inc.*
  463 F.3d 1201 (11th Cir.  2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7

*Aurora Nat'l Bank v. Tri Star Marketing*
  990 F. Supp. 1020  (D.  Ill.  1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8

9

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544, 127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

10

*Board of County Commissioners v. Brown Group Retail, Inc.*
598 F. Supp. 2d 1185 (D.  Colo.  2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11

12

*California v.  M & P Investments,*
308 F. Supp. 2d 1137 (E.D. Cal.  2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13

*Cameron v.  Peach County, Georgia*
  2004 WL 5520003 (M.D. Ga.  2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14

15

*Cayman Exploration Corp.  v.  United Gas Pipe Line Co.*
  873 F.2d 1357 (10th Cir.  1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

16

*City of Toledo v.  Beazer Materials & Services, Inc.*
833 F. Supp. 646 (N.D. Ohio 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

17

18

*Conley v. Gibson*
  355 U.S. 41, 78 S. Ct. 99 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17,18

19

*Cooper v. Bell*
  628 F.2d 1208 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20

21

*Davis v. Monroe County Bd. of Educ.*
526 U.S. 629, 119 S. Ct. 1661 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22

*Dydio v. Hesston  Corp.*
  887 F. Supp. 1037 (N.D. Ill.  1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

23

24

*Gache v.  Town of Harrison, New York*
  813 F. Supp. 1037 (S.D. N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25

ii

26

27

28

*Gilligan v. Jamco Dev. Corp.*
  108 F.3d 246 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*
 484 U.S. 49, 108 S. Ct. 376 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gompper v. VISX, Inc.*
298 F. 3d 893 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Marrero Hernandez v. Esso Standard Oil Co.*
597 F. Supp. 2d 272 (D.P.R. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*North Carolina Wildlife Federation v. Woodbury*
 1989 WL 106517 (E.D.N.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Parks School of Business, Inc. v. Symington*
51 F.3d 1480 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Raymond K. Hoxsie Real Estate Trust v. Exxon Education Foundation*
81 F. Supp. 2d 359 (D. R.I. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rutman Wine Co. v. E & J Gallo Winery*
829 F. 2d 729 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Swierkiewicz v. Sorema N.A.*
 534 U.S. 506, 122 S. Ct. 992 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*
 849 F.2d 1568 (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bestfoods*
524 U.S. 51, 118 S. Ct. 1876 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Usher v. City of Los Angeles*
828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Westlands Water Dist. v. U.S. Dept. of Interior, Bureau of Reclamation*
 805 F. Supp. 1503 (D.C. Cal. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**STATUTES**

Resource Conservation and Recovery Act - 42 U.S.C. 1601, et seq . . . . . . . . . . . . . . . passim

         § 6902(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         § 6972 (a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

         § 6972 (a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

40 C.F.R. § 280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 280.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 280.53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 280.62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 280.63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 280.64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 280.65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 280.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FRCP Rule 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**REFERENCES**

Wright & Miller, Federal Practice and Procedure: Civil 3d § 1356, 1357 . . . . . . . . . . . . . . . . . . . . . . .

iv

## A.    INTRODUCTION

Exxon Mobil Corporation ("Exxon") has filed a motion under FRCP 12(b)(6) requesting this Court dismiss Plaintiff's First, Third, Fourth and Fifth Claims for Relief under RCRA Subsection A (42 U.S.C. § 6972(a)(1)(A), by reason of Exxon's contention that Subsection A of RCRA does not apply to "wholly past violations."

The gravamen of Exxon's claim is twofold: (1) Exxon claims it has not owned or operated any of the three service station sites at issue in this case since sometime during the year 2000, and that RCRA, its implementing regulations under 40 C.F.R. § 280, and the California law applicable to this case require that only *present* owners and operators are obligated to remediate a site contaminated by petroleum hydrocarbons;  (2) Exxon further contends that 42 U. S. C. § 6972(a)(1)(A) specifically does not apply to violations of RCRA which are "wholly past."  And in this particular case,  Exxon takes the position that the contamination at each of the sites at issue is "wholly past," in that Exxon has had no opportunity to cause any further unauthorized discharges at the sites for the past 10 years.

However, according to the Regional Water Quality Control Board ("RWQCB") oversight of the sites at issue, Exxon remains liable and solely responsible for their complete remediation – not the present owner or operator of each of the sites. On this basis Plaintiff Northern California River Watch ("NCRW") believes there is no legitimate basis for dismissal of any of NCRW's allegations against Exxon.  As the primary responsible party, Exxon has continuing obligations to remediate the sites.

As Exxon has been unwilling to take the necessary actions to remediate the sites despite RWQCB oversight, NCRW is compelled to seek the assistance of the District Court so that Exxon may be persuaded to meet its statutory obligations.

## B.    STATEMENT OF FACTS

On or about June 5, 2009 NCRW served  its initial Notice of Violations and Intent to File  Suit to the CEO of Exxon, advising of NCRW's concerns about the current remediation status of three, former service stations for which Exxon has remained legally responsible for

1   hydrocarbon cleanup under RCRA and State of California water quality provisions, identified

2   as follows:

3         Former Station # 7-0249 - 6301 Commerce Boulevard, Rohnert Park, CA

4         Former Station # 7-0248 - 175 Southwest Boulevard, Rohnert Park, CA

5         Former Station # 7-0241 -5153 Old Redwood Highway North, Petaluma, CA.

6         Prior to approximately June of 2000, Exxon owned and/or operated each of the sites

7   after acquiring the properties, their underground storage tanks ("USTs") and dispensing systems

8   from Texaco Corporation.   Since approximately June of 2000, Exxon has sold or otherwise

9   transferred each of these properties to Whiteys TBA Inc., and the sites have continued as

10  gasoline service stations, currently branded as Valero.  On the basis of current records from the

11  RWQCB,  there has been no release of petroleum hydrocarbons while these sites have been

12  under the ownership and/or management of Whiteys TBA, Inc. There are, however, continuing

13  concerns about on-going petroleum pollution which exists in the soils and groundwater under

14  and around each of the sites.  In each case surface water in the vicinity of these sites is now at

15  risk from the migration of such contamination through preferential pathways such as storm

16  drains and other conduits, including seepage down through underlying aquifers. Exxon is legally

17  obligated to address these concerns under RWQCB oversight, but has not adequately met those

18  obligations.

19        During its term of ownership and/or operation of each of the service stations, Exxon

20  became legally responsible, under provisions of the RCRA and correlative State of California

21  water remediation provisions, for the cleanup of the on-going petroleum hydrocarbon

22  contamination at each of the sites.  The oversight of the remediation remains with the RWQCB

23  which is the local agency tasked with the responsibility for the elimination of contamination to

24  soil and groundwater in California. It is the mission of the RWQCB to insure that damage due

25  to this type of contamination is fully remediated by Responsible Parties, and in this particular

26  case, to insure that each of the sites is required to be cleaned up to the extent that the State of

27  California's Maximum Contaminant Levels ("MCLs") of toxic pollutants are eventually realized.

28

The RWQCB has adopted Maximum Contaminant Levels and/or Water Quality Objectives ("WQOs") for petroleum constituents in surface and groundwater within the region of 50 ppb for TPHg [hydrocarbons as gasoline], 1 ppb for benzene, 150 ppb for toluene and 5 ppb for MTBE.

Unfortunately, Regional Water Quality Control Boards in California are currently unable to effectively oversee UST remediation efforts by all Responsible Parties who have currently or have had leaking USTs in California (the EPA estimates that there are approximately 12,000 uncompleted remediations of leaking USTs in California)[1], and in certain instances, organizations like NCRW rely upon the citizen suit provisions of the RCRA to seek Court assistance in the remediation of sites which have been left without Corrective Action Plans which would lead to eventual site cleanup.

In the case of the subject sites, Exxon has either caused unauthorized releases of petroleum contaminants, or has legally agreed to become the Responsible Party required to achieve cleanup.  There is no other entity who might be required to step in to do so.   If Exxon does not fulfill this task, no one else has the obligation to do so.   For two of the sites, however, as detailed below, there is no current remediation in progress.

### 1.    6301 Commerce Boulevard, Rohnert Park, CA

Monitoring wells were installed at this site in 1987, but active remediation has apparently never been commenced, despite the presence of high levels of petroleum hydrocarbons at and around the site in subsurface soils and groundwater.  Efforts to fully delineate the site have yet to be completed.  Sensitive receptor survey data indicates there are 9 active municipal wells within 1,500 meters of the site, the nearest of which is 1,300 feet to the northeast.  The nearest downgradient municipal well is approximately 1,800 feet southwest of the site.  Private water wells have been found at approximately 975 feet from the site.   Hinebaugh Creek is located

---

[1]   U.S. EPA., UST/LUST Program in California, UST performance measures as of 9/30/2009. Cf. www. epa.gov/oust/states/ca.htm.

1    approximately 950 feet to the north.  Copeland Creek is located approximately 1,800 feet to the

2    south.  Both creeks flow westward.  Contaminant concentration levels in soil and groundwater

3    remain excessively above State MCLs and WQOs.  Based upon the most recent monitoring in

4    July of 2009, gasoline ("TPHg") in groundwater is as high as 37,000 ug/l, and diesel ("TPHd")

5    in groundwater is as high as 6,300 ug/l.

6         It is apparent from a review of the history of this site that Exxon is attempting to rely upon

7    "natural attenuation" rather than active remediation efforts to eliminate the threat of

8    contamination to the surrounding environment.  NCRW believes that more proactive remediation

9    strategies need to be employed to prevent further environmental damage.  At present it appears

10   nothing more than groundwater monitoring is occurring periodically.  Monitoring alone does

11   nothing to achieve site remediation goals.

12        **2.    175 Southwest Boulevard, Rohnert Park, CA**

13        After Exxon assumed legal responsibility for remediation of the site between 1996 and

14   2004, its remediation consultants installed a soil vapor extraction system and a groundwater

15   extraction treatment system.  However, remediation work was discontinued in 2004 due to

16   Exxon's inability to renew its NPDES permit due to issues with meeting Tert-butyl alcohol

17   discharge limits and bio-assay requirements.   It was then determined that obtaining a sewer

18   discharge permit from the city of Rohnert Park would not be cost effective, and the remediation

19   equipment was eventually removed.  No remediation has occurred since the latter part of 2004.

20        Depth to groundwater varies at the site from between 2.7 feet to 37.9 feet, depending

21   upon the season.  Groundwater generally flows to the north and northwest under the site.  The

22   site lies above an aquifer used as a source of the water supply for the local community.

23   Groundwater in the site vicinity has been designated as having a beneficial use for municipal,

24   industrial, and agricultural applications, according to the RWQCB's Water Quality Control Plan.

25   Three groundwater production wells have been identified within 1,800 to 2,000 feet of the site.

26   The nearest surface water is a northwestward flowing unnamed drainage ditch located 250 feet

27   southwest.  Concentration levels in soil and groundwater remain excessively above State MCLs

28

1  as well as WQOs.  On the basis of monitoring reports dated July of 2009, TPHg was as high as

2  25,000 ug/l, the benzene level was at 56 ug/l, Tert-butyl alcohol was at 5,800 ug/l, xylenes

3  concentration level was at 4,000 ug/l, and MTBE was found to be at 200 ug/l.

4      At the present time no remediation is being accomplished, although site remediation

5  remains necessary.  Exxon is apparently content to obtain site remediation sometime in the next

6  20 to 30 years by means of natural attenuation.  No estimates of the residual contaminant plume

7  mass have been found, and no estimate of the length of time to remediate the site to MCL levels

8  has been done.  NCRW contends provisions of the RCRA require that Exxon work much more

9  proactively to neutralize the soil and groundwater beneath and around this site by employing best

10  available technology as required by the RWQCB's Water Quality Control Plan.

11      **3.      153 Old Redwood Highway North, Petaluma, CA**

12      A groundwater extraction system for remediation of groundwater contamination was

13  installed and operated between September of 1995 and May of 1997 while this site was still

14  under Texaco's control. Subsequent to October of 2005, Exxon reinstalled a groundwater

15  extraction system and an soil vapor extraction system.

16      Depth to groundwater varies from between 3.6 feet to 30.4 feet, depending upon the

17  season.  Groundwater generally flows to the southeast and periodically to the southwest under

18  the site, generally towards the Petaluma River.  The site lies above an aquifer used as a source

19  of water supply for the local community.  Groundwater in the site vicinity has been designated

20  as having a beneficial use for municipal, industrial, and agricultural applications, according to

21  the RWQCB's Water Quality Control Plan.

22      Contaminant concentration levels in soil and groundwater remain excessively above State

23  MCLs and WQOs.  On the basis of current monitoring reports dated July of 2009, TPHg is as

24  high as 57,000 ug/l, TPHd is as high as 42,000 ug/l, the benzene level is at 84 ug/l, and

25  ethylbenzene is currently at 690 ug/l.

26      At the present time Exxon is conducting soil vapor extraction in conjunction with

27  pumping and treating groundwater.  High vacuum dual-phase extraction has been determined

28

to be the *only feasible remediation strategy* (because of limited range-of-influence due to the site's soil characteristics), but estimates of residual hydrocarbon mass have apparently been greatly underestimated. Reports in July of 2003 estimated that at then-projected extraction rates, remediation to acceptable levels would occur within 3 years, which has not happened. One of the monitoring wells has recently contained pure product, the origins of which have apparently not been determined inasmuch as the only reported release occurred over 20 years ago.

The site remains a threat to the local human population and environment in terms of the potential affect upon the underlying aquifer. NCRW contends Exxon must work much more proactively to neutralize the soil and groundwater beneath and around the site by employing best available technology as required by the Water Quality Control Plan. A storm drain which runs approximately 30 feet from the site and beneath Redwood Highway, discharging to the Petaluma River must be tested as a preferential pathway for hydrocarbons coming from the site. Sewer cleanouts connected to the building on the site should also be tested as a potential preferential pathway. NCRW has found no testing of these conduits in the available records.

Current levels of groundwater extraction seem to be insufficient for the size of the plume to be remediated. Available data on this site should include current estimates of contaminant plume mass and projected remediation dates at the present rates of extraction. In this particular case, specific soil over-excavation may be required to recover any pure product which persists in one of the wells.

## C.   APPLICABLE LAW

The RCRA is a comprehensive, environmental statute which establishes a cradle-to-grave system for regulating the disposal of solid and hazardous waste. The primary purpose of RCRA is to "reduce the [current] generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" [Cf. 42 U.S.C. § 6902(b).] The EPA has the chief responsibility for the implementation and enforcement of RCRA. The EPA accordingly provides regulatory guidance for states, and delegates its responsibilities under

RCRA to state agencies.   Like other environmental laws, however, RCRA also provides for individual citizen suits against violators who are not in compliance with mandated regulations and agency orders.  Pursuant to RCRA,  the U.S. EPA has issued regulations detailing the standards for disposal of solid and hazardous waste.

NCRW filed its Complaint against Exxon under the provisions of RCRA known as "citizen enforcement actions," and "imminent hazard actions, " , 42 U.S.C. § 6972 (a)(1)(A) and § 6972 (a)(1)(B) respectively.

### 1.     NCRW's 42 U.S.C. § 6972 (a)(1)(B) Imminent Hazard Claim

In order to bring an action under this section of the RCRA, a citizen suit may allege violations against any person,

> . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment... [42 U.S.C. § 6972 (a)(1)(B)]

Exxon has not taken exception to NCRW's Second Claim for Relief because Exxon does not deny that it qualifies as a "past or present owner or operator."

### 2.     NCRW's 42 U.S.C. § 6972 (a)(1)(A) Enforcement Action

In order to bring a justiciable claim under 42 U.S.C. § 6972 (a)(1)(A) there must be an *ongoing violation* of a RCRA permit, standard, regulation, condition, requirement, prohibition, or order.  The gravamen of Exxon's present Motion is whether it may be deemed a present owner or operator  with  respect  to  NCRW's  allegations  under  42  U.S.C.  §  6972(a)(1)(A)  as distinguished from NCRW's allegations under 42 U.S.C. § 6972 (a)(1)(B).

### D.     SUMMARY OF ARGUMENT

1.     Exxon is subject to liability under RCRA by virtue of being in current violation of a permit, standard, regulation, condition, requirement, prohibition, or order resulting from Exxon's alleged violations of RCRA as stated in NCRW's Complaint.

1    2.      Exxon's RCRA violations as alleged by NCRW are not "wholly past" because Exxon has

2           continuing obligations under RCRA to fully complete the remediation of the 3 sites at

3           issue.

4    3.      A motion to dismiss challenges the sufficiency of the complaint. Dismissal of claims are

5           warranted only if no relief could be granted under any plausible set of facts that could be

6           proved consistent with the allegations.

7  **E.     ARGUMENT**

8           Exxon argues that in the 5 years preceding the filing of NCRW's Complaint (i.e. within

9    the statutory period applicable to RCRA claims), it has not "owned or operated" the 3 sites at

10   issue, and therefore cannot be deemed responsible for obligations to remediate the sites under

11   RCRA.   Also, that the contamination at the sites results from violations that are "wholly past"

12   for purposes of determining whether NCRW's claims against Exxon under 42 U.S.C. § 6972

13   (a)(1)(A) are judicially cognizable. As such violations are "wholly past", Exxon takes the

14   position that it cannot be currently violating any applicable permit, standard, regulation, order,

15   etc., pursuant to RCRA.

16  **1.     Exxon Has Ongoing Liability for Current RCRA Violations by Reason of Its**

17         **Failures to Remediate the Sites**

18           NCRW alleges in its Complaint that Exxon has ongoing liability under RCRA for current

19   violations of regulations adopted for the purpose of implementing RCRA provisions.  These

20   RCRA Regulations from 40 C.F.R. § 280 include:

21           **§ 280.51 Investigation due to off-site impacts.**
             When required by the implementing agency, owners and operators of UST
22           systems must follow the procedures in § 280.52 to *determine if the UST system
             is the source of off-site impacts.* These impacts include the discovery of
23           regulated substances (*such as the presence of free product or vapors in soils,
             basements, sewer and utility lines, and nearby surface and drinking waters) that*
24           has been observed by the implementing agency or brought to its attention by
             another party.  (Emphasis added.)

25           **§ 280.53 Reporting and cleanup of spills and overfills.**
26           (a) Owners and operators of UST systems must contain and immediately clean
             up a spill or overfill and report to the implementing agency within hours, or
27           another reasonable time period specified by the implementing agency, *and begin*

28

*corrective action* in accordance with subpart F in the following cases: (1) Spill or overfill of petroleum that results in a release to the environment that exceeds 25 gallons or another reasonable amount specified by the implementing agency, or that causes a sheen on nearby surface water; and (2) Spill or overfill of a hazardous substance that results in a release to the environment that equals or exceeds its reportable quantity under CERCLA (40 CFR part 302). (Emphasis added.)

**§ 280.62 Initial abatement measures and site check.**
(6) *Investigate to determine the possible presence of free product, and begin free product removal as soon as practicable* and in accordance with § 280.64. (Emphasis added.)

**§ 280.63 Initial site characterization.**
(a) Unless directed to do otherwise by the implementing agency, owners and operators must assemble information about the site and the nature of the release, including information gained while confirming the release or completing the initial abatement measures in §§ 280.60 and 280.61. This information must include, but is not necessarily limited to the following: (1) *Data on the nature and estimated quantity of release; (2) Data from available sources and/ or site investigations concerning the following factors: surrounding populations, water quality, use and approximate locations of wells potentially affected by the release, subsurface soil conditions, locations of subsurface sewers, climatological conditions, and land use*.... (Emphasis added.)

**§ 280.64 Free product removal.**
At sites where investigations under § 280.62(a)(6) indicate the presence of free product, owners and operators *must remove free product to the maximum extent practicable as determined by the implementing agency* while continuing, as necessary, any actions initiated under §§ 280.61 through 280.63, or preparing for actions required under §§ 280.65 through 280.66. In meeting the requirements of this section, owners and operators must: (a) Conduct free product removal in a manner that minimizes the spread of contamination into previously uncontaminated zones by using recovery and disposal techniques appropriate to the hydrogeologic conditions at the site, and that properly treats, discharges or disposes of recovery byproducts in compliance with applicable local, State and Federal regulations; (b) *Use abatement of free product migration as a minimum objective for the design of the free product removal system*.... (Emphasis added.)

**§ 280.65 Investigations for soil and ground-water cleanup.**
(a) In order to *determine the full extent and location of soils contaminated by the release and the presence and concentrations of dissolved product contamination in the ground water*, owners and operators must conduct investigations of the release, the release site, and the surrounding area possibly affected by the release if any of the following conditions exist: (1) There is evidence that groundwater wells have been affected by the release (e.g., as found during release confirmation or previous corrective action measures); (2) Free product is found to need recovery in compliance with § 280.64; (3) There is evidence that contaminated soils may be in contact with ground water (e.g., as found during conduct of the initial response measures or investigations required under §§ 280.60 through 280.64).... (Emphasis added.)

**§ 280.66 Corrective action plan.**

(a) At any point after reviewing the information submitted in compliance with §§ 280.61 through 280.63, the implementing agency may require owners and operators to submit additional information or to develop and submit a corrective action plan for responding to contaminated soils and ground water. If a plan is required, owners and operators must submit the plan according to a schedule and format established by the implementing agency. Alternatively, owners and operators may, after fulfilling the requirements of §§ 280.61 through 280.63, choose to submit a corrective action plan for responding to contaminated soil and ground water. *In either case, owners and operators are responsible for submitting a plan that provides for adequate protection of human health and the environment as determined by the implementing agency, and must modify their plan as necessary to meet this standard.* (b) The implementing agency will approve the corrective action plan only after ensuring that implementation of the plan will adequately protect human health, safety, and the environment. In making this determination, the implementing agency should consider the following factors as appropriate: (1) The physical and chemical characteristics of the regulated substance, including its toxicity, persistence, and potential for migration; (2) The hydrogeologic characteristics of the facility and the surrounding area; (3) The proximity, quality, and current and future uses of nearby surface water and ground water; (4) The potential effects of residual contamination on nearby surface water and ground water; (5) An exposure assessment; and (6) Any information assembled in compliance with this subpart. (c) *Upon approval of the corrective action plan or as directed by the implementing agency, owners and operators must implement the plan, including modifications to the plan made by the implementing agency. They must monitor, evaluate, and report the results of implementing the plan in accordance with a schedule and in a format established by the implementing agency....* (Emphasis added.)

## A.   Exxon's Violations of These Regulatory Requirements

As referenced in the Statement of Facts, with respect to the **6301 Commerce Boulevard** site, Exxon has never completed a full delineation of the contamination as a necessary preliminary requirement towards remediation. Exxon (or its consultants) has not implemented a corrective action plan, and the site has never been actively engaged in remediation. The soil and groundwater in and around the site remain contaminated, and without more proactive involvement, will continue to be contaminated for the indefinite future. The only work occurring at the present time (and for the previous 20+ years) is the bare monitoring of levels of contamination. Meanwhile, the petroleum hydrocarbons continue to affect the surrounding environment and probably the underlying aquifer. This lack of remedial effort on the part of Exxon amounts to violations of 40 C.F.R. §§ 280.51, 280.53, 280.65 and 280.66.

1    Similarly, no remediation has occurred at the **175 Southwest Boulevard** site, over the

2    past 6 years since efforts were suspended.  The underlying aquifer is currently at risk, and

3    petroleum hydrocarbon contamination remains in the soil and groundwater, as they have since

4    the initial release in 1986.  Exxon apparently is determined to allow the contamination to remain

5    until it is dissipated by "natural attenuation," instead of actively conducting remediation work

6    to eliminate the threats to the local environment.  This lack of remedial effort on the part of

7    Exxon amounts to violations of 40 C.F.R. §§ 280.51, 280.53, 280.65 and 280.66.

8    With respect to the **5153 Old Redwood Highway North** site **,** high vacuum dual-phase

9    extraction has apparently been determined to be the only realistically feasible means of

10   attempting to remediate this site (according to Exxon consultants), but that technology has not

11   as yet been introduced, based upon the most recent consultant reports reviewed by NCRW.  The

12   first release was discovered over 22 years ago.  Since that time, groundwater extraction has been

13   used for a total of only 7 years – but not the kind of extraction that has been deemed to achieve

14   effective remediation given the nature of the surrounding soil composition.  Corrective action

15   work has not been effective to date, and given the current strategies employed, there is no end

16   in sight to the ongoing threat to local drinking water supplies, the underlying aquifer, and to the

17   neighboring environment.  This lack of remedial effort on the part of Exxon also amounts to

18   violations of 40 C.F.R. §§ 280.51, 280.53, 280.65 and 280.66.

19   **B.     Such Violations of RCRA Regulations Have Been Held to Prolong the**

20   **Liability of Former Owners or Operators of UST Sites**

21   On their face, these regulations seem to suggest, as Exxon would have the Court believe,

22   that only *current* "owners or operators" are required to comply with each of the regulations cited

23   above as well as those regulations itemized in NCRW's Notice of Violations and referenced in

24   its Complaint.  A number of federal court decisions, however, have weighed in on the issue,

25   holding that parties responsible for contamination, even *previous* owners or operators, fall within

26   the provisions of  42 U.S.C. § 6972 (a)(1)(A) enforcement actions.

27

28

In *California v. M & P Investments,* 308 F. Supp. 2d 1137, 1146 (E.D. Cal.  2003), the District Court was faced with RCRA claims by the City of Lodi against the owner or operator of a dry cleaning facility, after PCE and TCE were found in 1989 to have contaminated several of the city's municipal supply wells.  The court stated that in order to bring a claim under RCRA § 7002(a)(1)(A), there must be an ongoing violation of a RCRA permit, standard, regulation, condition, requirement, prohibition, or order.[2]

However, in determining that a past polluter would still have liability under the ongoing violation provisions of 42 U.S.C. § 6972 (a)(1)(A), the court in *M & P Investments* held:

> A number of federal courts have held that the continued presence of hazardous contaminants is sufficient to constitute an ongoing violation in support of a RCRA claim. See Fallowfield Dev. Corp. v. Strunk, No. 89-8644, 1990 WL 52745 (E.D. Penn.1990), at *10 ("If a person disposes of hazardous waste on a parcel of property, the hazardous waste remains in that property insidiously infecting the soil and groundwater aquifers. In other words, the violation continues until the proper disposal procedures are put into effect or the hazardous waste is cleaned up.")

Citing the case of *Gache v.  Town of Harrison, New York*, 813 F. Supp 1037, 1041 (S.D. N.Y. 1993),  the *M & P Investments* court noted that improperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA.

*Acme Printing Ink Co.  v. Menard, Inc.,* 891 F. Supp. 1289, 1303 (E.D. Wis. 1995), also stands for the proposition that because improperly disposed of hazardous waste remains a remedial threat to the environment, Congress must have intended to allow citizen suits under section 7002 [6972] of the RCRA for past violations where the effects of the violation remain remediable. The court in *Acme* noted the following regarding the intent of Congress in drafting the 42 U.S.C. § 6972  (a)(1)(A) enforcement section:

> By simply ceasing to 'operate' before or even after a citizen suit is filed under § 6972(a)(1)(A), any owner of a hazardous waste facility that was previously

---

[2]  RCRA is codified at 42 U.S.C. §§ 6901 *et seq.* (1994, Supps. 1996, 1997). It is worth clarifying that some courts, in discussing RCRA, refer to its provisions by the section numbers found in the act as enacted in 1976. Thus, for example, 42 U.S.C. § 6972 is sometimes referred to as § 7002 of the 1976 act and 42 U.S.C. § 6973 as § 7003. *See* Pub. L. No. 94-580, §§ 7002, 7003, 1976 U.S.C. C.A.N. (90 Stat.) 2825, 2826 (codified at 42 U.S.C. §§ 6972,  6973).

1

operating ... can entirely avoid liability for the harmful, continuing effects of
their regulatory violations. Worse, by simply ceasing to 'operate,' the owner of
a hazardous waste facility can effectively self-exempt themselves from some of
the most environmentally important and protective regulations." (Plaintiff's
Combined Brief at 40. *See also* Fallowfield, 1990 WL 52745 at *10.) We agree
with the plaintiff and the *Fallowfield* Court that Congress could not have
intended to allow an owner or operator of a hazardous waste facility to control
his own liability in this manner. (*Id.* at 1303.)

2

3

4

5

6

*Cameron v. Peach County, Georgia,* 2004 WL 5520003 (M.D. Ga. 2004), held that in

7

a (a)(1)(A) enforcement case, like the ones cited above:

8

To allow a citizen suit only in situations where an owner or operator of a
hazardous waste facility is disposing of hazardous waste on a daily basis would
virtually read [the enforcement provision] out of RCRA .... a general rule may
be gleaned that the disposal of wastes can constitute a continuing violation ... as
long as the waste has not been cleaned up and the environmental effects remain
remedial. (*Id.* at *27.)

9

10

11

12

In *City of Toledo v. Beazer Materials & Services, Inc.,* 833 F. Supp. 646, 656, 38 E.R.C.

13

1458 (N.D. Ohio 1993), a former owner/operator of a coke producing plant brought a motion to

14

dismiss in a case filed by the City of Toledo involving alleged RCRA regulation violations,

15

including failure to implement corrective actions. In denying the defendant's motion, the court

16

noted that a number of district courts have held that the continued presence of illegally dumped

17

hazardous waste may constitute a "current violation" of a RCRA violation or standard, despite

18

the fact that the operator's conduct occurred in the past. Quoting *North Carolina Wildlife*

19

*Federation v. Woodbury,* 49 E.R.C. 1941, 1943; 1989 WL 106517; 1989 U.S. Dist. LEXIS

20

13915 (E.D.N.C. 1989), the *City of Toledo* court noted that "it is not the physical act of

21

discharging dredge wastes itself that leads to the injury giving rise to citizen standing [for

22

(a)(1)(A) violations], but the consequences of the discharge in terms of the lasting environmental

23

degradation."

24

The City of Toledo court went on to state:

25

"Because improperly disposed of hazardous waste remains a remediable threat
to the environment, this Court believes that Congress intended to allow citizen
suits under section 7002 of RCRA for past violations where the effects of the
violation remain remediable. To conclude otherwise would allow an owner or
operator of a hazardous waste facility to avoid liability under section 7002 by

26

27

28

1  claiming that the last improper disposal of hazardous waste prior to the
2  commencement of the suit was the last disposal, making the violations wholly
   past. In this way, the owner or operator could easily avoid liability by simply not
   disposing of any hazardous waste after the commencement of a citizen suit.
3  This Court does not believe that Congress intended to allow the owner or
   operator of a hazardous waste facility to have complete control over his liability
4  under section 7002". *Id.* at 656.

5  See also *Aurora Nat'l Bank v. Tri Star Marketing,* 990 F. Supp. 1020, 1024 (D. Ill.

6  1998); *Raymond K. Hoxsie Real Estate Trust v. Exxon Education Foundation*, 81 F. Supp.2d

7  359, 364 (D. R.I. 2000), for the same holdings with respect to 42 U.S.C. § 6972 (a)(1)(A)

8  claims brought against prior owners or operators who caused or contributed to contamination

9  which had not been adequately treated or remediated.

10 In *Atlantic Gas Light Co. v. UGI Utils., Inc.* 463 F. 3d 1201, 1206 (11th Cir. 2006), a case

11 filed under CERCLA provisions, the Circuit Court held that "operator" status requires that an

12 operator must have "managed, directed, or conducted operations specifically related to pollution,

13 that is, operations having to do with the leakage or disposal of hazardous waste, or have made

14 decisions about compliance with environmental regulations.[3]

15 The statutory definitions of "operator" are the same under RCRA as they are under

16 CERCLA, and the standards for owner and operator liability under the two statutes are identical.

17 See *Tanglewood East Homeowners v. Charles-Thomas, Inc.* 849 F. 2d 1568, 1574 (5th Cir.

18 1988).

19 Here, on the basis of its obligations to remediate in conjunction with formal requirements

20 by the RWQCB, Exxon remains legally and solely responsible to the management and

21 remediation of the hazardous petroleum wastes at each of the sites at issue. Exxon is actually

22 involved in "managing, directing, or conducting operations specifically related to pollution" at

23 these sites. As such, Exxon can only be deemed a *current* operator for purposes of 42 U.S.C.

24 § 6972 (a)(1)(A) enforcement claim liability. No one else at or in relation to these sites has

25 these responsibilities, and no one else will inherit them from Exxon.

26

27 [3] See also, *United States v. Bestfoods,* 524 U.S. 51, 66-67, 118 S. Ct. 1876, 1887 (1998).

28

1   NCRW contends Exxon has violated the provisions of RCRA by avoiding its

2   responsibilities to remediate these sites over the past 5 years.  The obligations to remediate are

3   ongoing and include violations that continue to occur.  As a result, they fall within the previous

4   5- year statute applicable to RCRA actions.  It is of no relevance to Exxon's defense then, that

5   the last involvement by Exxon at these sites occurred sometime in the year 2000.

6           **C.      Exxon's Case Authority Represents Decisions  in a Minority of Courts**

7           Exxon cites the case of *Board of County Commissioners v. Brown Group Retail, Inc.,* 598

8   F. Supp. 2d 1185 (D.  Colo.  2009) for the blanket proposition that all past violations are not

9   actionable under subsection A of RCRA.  As the cases NCRW cites have established, *Brown*

10  *Group Retail* represents a minority determination, and certainly one not followed in the 9th

11  Circuit.  Its rationale cannot withstand serious scrutiny by courts attempting to achieve the goals

12  of RCRA in achieving the health and restoration of groundwater and surface waters which are

13  so crucial to our welfare as a population.

14          The defendant in *Brown Group Retail* owned and operated a rifle scope manufacturing

15  facility which had allowed solvents at the facility to spill and leak onto the floor.  The solvents

16  were cleaned up by flushing them into drains, eventually contaminating the soil and groundwater

17  beneath the facility.  The Brown Group took no measures to abate or contain the contamination,

18  and its last involvement with the property occurred in 1983 when it was sold to the County of

19  La Plata. After acquiring the property, however, the County did not file a complaint against the

20  Brown Group and other defendants until 2008, *25 years later.*  After selling the facility the

21  Brown Group conducted no activity on the property, including no remediation work.  As a result,

22  the *Brown Group Retail* court held that once a defendant is no longer an owner or operator of

23  a polluting facility, it has "no control over the pollution source" and would have no ability to

24  "bring itself into complete compliance."*Id.*  at 1200. As a consequence, the court determined that

25  in this particular case the violation was "wholly past."

26          As the facts in the instant case establish, Exxon has had ongoing responsibility for the

27  unfinished remediation of the sites at issue, and cannot hope to compare its conduct with that of

28

1   the Brown Group.

2   **2.      Exxon's Alleged Violations Are Not Wholly Past Because the Need for Remediation**

3           **Continues**

4           In  *Marrero Hernandez v. Esso Standard Oil Co.,* 597 F. Supp. 2d 272, 283 (D.P.R.

5   2009), the court held that unremediated, migrating contamination is not a "wholly past"

6   violation.

7           In *Dydio v. Hesston Corp.,* 887 F. Supp. 1037, 1045 (N.D. Ill. 1995), a UST case filed

8   under RCRA provisions, the defendant last used the USTs sometime in 1975 and had no

9   apparent involvement with them since that time.   However, the contamination on the property

10  consisted of petroleum-contaminated soil containing known carcinogens including benzene and

11  ethylbenzene as well as suspected carcinogens including toluene and xylene.   Despite notice

12  provided to Hesston by Dydio, Hesston refused to undertake corrective action with respect to the

13  contaminated property.   Hesston sought refuge under the authority of *Gwaltney* [4] claiming that

14  any impact he effected was a "wholly past" violation of the RCRA and not justiciable at the time

15  the complaint was filed after contamination was discovered in the 1990s.   In denying the

16  defendant's attempt to evade liability the court stated:

17          This Court does not regard Dydio's allegations as simply classifying a wholly
            past violation as an ongoing violation; instead, we find that the regulations
18          promulgated under subchapter IX create a regime under which past owners of
            USTs have continuing obligations to take corrective action following the
19          confirmed release of a regulated substance, and that Dydio has properly
            alleged a present violation of those regulations. Accordingly, Hesston's motion
20          to dismiss count I on the ground that it alleges a wholly past violation is
            denied.

21

22          Generally, the rationale for holding that Exxon's violations in the case at bar fall within

23  42 U.S.C. § 6972(a)(1)(A) are the same in finding that such violations are not "wholly past."

24  There is no essential distinction between the two issues.   In the instant case, Exxon's continuing

25  _____

26  [4]   *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 108 S. Ct. 376, 98 L.
       Ed.2d 306 (1987)

27

28

1  obligation under the RCRA and implementing State of California provisions to clean up the UST

2  sites at issue establishes that there is no viable basis for the claim that Exxon's conduct is

3  "wholly past."  The gravamen of NCRW's claims against Exxon is simply to have its remedial

4  work obligations accelerated so that further damage may not occur to the environment.

5  **3.      Federal Law Applicable to Motions to Dismiss under FRCP 12(b)(6)**

6        The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the

7  statement of the claim for relief.  The motion is not a procedure for resolving a contest between

8  the parties about the facts or the substantive merits of the plaintiff's case.[5]

9        At the heart of the application of the Rule 12(b)(6) motion, and one that is of universal

10  acceptance, is the proposition that for purposes of the motion to dismiss, (1) the complaint is

11  construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3)

12  all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader.[6]

13        Dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because

14  the district court normally will give the plaintiff leave to file an amended complaint to see if the

15  shortcomings of the original document can be corrected.[7]

16        *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957), sets forth the

17  general rubric under which complaints may be tested by motions to dismiss:

18        In appraising the sufficiency of the complaint we follow, of course, the accepted
      rule that a complaint should not be dismissed unless it appears beyond doubt that
19        the plaintiff can prove no set of facts in support of his claim which would entitle
      him to relief.

20

21

---

22  [5]  Wright & Miller, Federal Practice and Procedure: Civil 3d § 1356.  See also: *Rutman Wine Co. v E.
23  & J. Gallo Winery*, 829 F. 2d 729, 738 (9th Cir. 1987).

24  [6]  *Ibid*., § 1357.  See also: *Swierkiewicz v. Sorema NA.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1
   (2002); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999);
25  *Westlands Water Dist. v. U.S. Department of Interior, Bureau of Reclamation,* 805 F. Supp. 1503 (D.C.
   Cal. 1992).

26  [7]  *Ibid., § 1357.*  See also *Gompper v. VISX, Inc.* 298 F.3d 893, 898 (9th Cir. 2002) (Dismissal without
   leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved
27  by any amendment.)

28

1    In 2007, however, the Supreme Court clarified *Conley v. Gibson* in *Bell Atlantic Corp.*

2  *v. Twombly* 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), stating the allegations

3  in a complaint must be evaluated to determine the "grounds" on which the plaintiff's claims rest.

4  According to the Court in *Ashcroft v. Iqbal,* 556 U.S. __, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d

5  868 (2009), the "plausibility" standard of *Twombly* is now broadly applicable to all civil cases.

6    Unchanged in the federal pleading standards is the principal that at this stage in the

7  litigation well-pleaded allegations alone will suffice.   The court must still take the non-moving

8  party's allegations as true and construe them in the light most favorable to the non-moving party.

9  *Parks School of Business, Inc. v Symington,* 51 F. 3d 1480, 1484 (9th Cir. 1995).   And courts

10 must also draw all reasonable inferences in favor of the non-moving party.   *Usher v. City of Los*

11 *Angeles*, 828 F. 2d 556, 561 (9th Cir. 1987).   And when the *non-moving* party has attached

12 exhibits to the complaint, those exhibits may be considered by the court without converting the

13 motion to one for summary judgment.   *Cooper v. Bell*, 628 F. 2d 1208, 1210, n.2 (9th Cir. 1980).

14  Generally, a Rule 12(b)(6) motion to dismiss for failure to state a claim is viewed with disfavor

15 and is rarely granted.   See *Gilligan v. Jamco Dev. Corp*, 108 F. 3d 246, 249 (9th Cir. 1997).

16    Granting a motion to dismiss is a harsh remedy which must be exercised with caution to

17 protect the liberal rules of pleading and the interests of justice.   *Cayman Exploration Corp. v.*

18 *United Gas Pipe Line Co.*, 873 F. 2d 1357, 1359 (10th Cir. 1989).   Thus, the Federal Rules of

19 Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a

20 claim. *Id.*

21 **F.    CONCLUSION**

22    On the basis of the arguments above, NCRW requests the Court deny Exxon's motion to

23 dismiss in each of its elements, and find that each of NCRW's claims for relief [Claims 1, 3, 4

24 and 5] pursuant to 42 U.S.C. § 6972 (a)(1)(A) are well-pleaded in reliance upon the facts of this

25 case as recited in NCRW's Complaint and Notice of Violations. In the event that some of

26 NCRW's pleadings may be deemed vague with respect to the causes of action alleged or the

27

28

1   relief requested, NCRW requests the Court allow NCRW to amend its Complaint so that this

2   action may proceed, and that the interests of justice may be achieved.

3

4   DATED: June 1, 2010                          Respectfully submitted,

5

6                                               ___/s/ Jack Silver_____
                                                JACK SILVER
                                                Attorney for Plaintiff
7                                               NORTHERN CALIFORNIA RIVER WATCH

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28